Wendell WENNER, Jr., Respondent,

v.

GULF OIL CORPORATION, Appellant.

No. 47201.

Supreme Court of Minnesota.

Feb. 17, 1978.

Gislason, Dosland, Malecki, Gislason & Halvorson, and James H. Malecki, New Ulm, for appellant.

Gault, Mackenzie, Gustafson & Litynski and W. M. Gustafson, St. Peter, for respondent.

Heard before YETKA, SCOTT and IVERSON, JJ., and considered and decided by the court en banc.

IRVING C. IVERSON, Justice.*

Plaintiff, Wendell Wenner, Jr., initiated this action against Gulf Oil Corporation, seeking damages for breach of warranty. Plaintiff alleges that defendant manufactured a defective herbicide, which damaged his wheat crop and reduced the yield from a 134-acre portion of his farm. Thereafter, defendant initiated third-party actions against Nicollet Ag Services, Inc., and Raymond Gieseke, the commercial applicators of defendant's product to plaintiff's field, seeking contribution and indemnity for all sums that may be adjudged against defendant. At the close of defendant's case, both third-party defendants' motions for directed verdicts were granted by the court. Subsequently, the jury returned a verdict against defendant in the sum of $10,164. Defendant appeals from the order denying its post-trial motion for a new trial and from the judgment.

Plaintiff, age 39, resides on a farm in Oshawa Township, near St. Peter, Minnesota, and has been farming for 20 years. He farms approximately 900 to 1,000 acres, raising corn, beans, sweet corn, peas, and wheat.

In the spring of 1974, plaintiff planted corn in a 150-acre field which became extremely weedy. In June 1974, when the weeds were approximately 4 to 6 inches high, plaintiff purchased 32 five-gallon cans of Outfox, a herbicide manufactured by defendant. Plaintiff then called the Nicollet Ag Services and requested that it apply the product aerially because the fields were too wet to apply the product by tractor. The product label contained no recommendations or warnings regarding aerial application.

The label on Outfox indicates that to control weeds 6 inches high it is necessary to apply 3 pounds of Outfox per acre. (One pound is equal to 1 gallon.) Third-party defendant Gieseke sprayed approximately 125 acres of the 150-acre field, leaving a 16-acre strip in the northern portion of the field and an 8- to 10-acre strip in the center of the field unsprayed. Plaintiff sprayed this center area with a ground sprayer, making a total of about 134 acres sprayed, and 16 acres unsprayed.

Within approximately 2 weeks after spraying, the weeds died, and there was no damage to the corn. In the fall of 1974, plaintiff plowed the 150-acre field, and in the spring of 1975, he cultivated the field, applied fertilizer before planting, and then planted spring wheat. When the wheat was approximately 4 to 6 inches high, plaintiff noticed that in the 134-acres which had been sprayed with Outfox the previous

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

year, the wheat was discolored and some plants were dying.

At trial, plaintiff testified that the damage to the 134-acre portion of the field was uniform. Robert Harris, a representative of defendant who viewed the field and took soil samples and pictures, testified that the damage to the 134-acre portion of the field sprayed with Outfox appeared in a pattern of stripes, or streaks, approximately 20 to 40 feet in width.

The soil samples taken by Harris were sent to defendant in Kansas City where various tests were performed. One test showed a soil content of .10 parts per million concentration of atrazine and .14 parts per million concentration of cyprazine. Cyprazine is the weed-killing compound in Outfox, and atrazine is a weed-killing compound found in products manufactured by other companies. Atrazine had been applied by plaintiff to the 150-acre field prior to 1974. Dr. Richard A. Schwartzbech, defendant's soil chemist, testified that the chemical composition of cyprazine is similar to that of atrazine and that if both compounds are found in particular soil, the killing effect on plants would be doubled. The Outfox label contains no warning against applying Outfox to a field that has been previously treated with atrazine.

Plaintiff harvested the wheat from the 150-acre field in the fall of 1975 and compared the yield of the 16 acres that had not been sprayed with that of the 134 acres that had been sprayed. He testified that the 134 acres produced 26.54 bushels per acre less than the unsprayed 16 acres.

The following issues are presented on appeal:

(1) Is an admission against interest made by plaintiff's attorney in a letter mailed to defendant admissible into evidence against plaintiff at trial?

(2) Did a hypothetical question given to plaintiff's expert contain all of the facts necessary to permit him to state an opinion?

(3) In a breach of warranty action in which there is evidence of plaintiff's negligence, was it error for the court to refuse to give a requested instruction on the comparative negligence of plaintiff?

(4) Was defendant's disclaimer of warranty clause effective under the provisions of Minn.St. 336.2–316(1)?

(5) Was the statutory duty set out in Minn.St.1974, §§ 18.031 to 18.032, applicable to plaintiff under the facts in this case?

1. *Attorney's Admissions.* Defendant's first assignment of error is the trial court's refusal to accept into evidence a letter written by plaintiff's attorney to defendant before formal commencement of this action. The letter indicated that the attorney had been retained by plaintiff to collect for damages plaintiff had sustained as a result of using defendant's product. It outlined the factual basis for plaintiff's claim against defendant and demanded full payment of the damages to avoid litigation.

Defendant attempted to prove at trial that by applying Outfox aerially, plaintiff had misapplied the product and had created the hazard of overlap, thereby increasing beyond recommended rates the amount of the product applied to certain areas. Such a misapplication would materialize in the field in a striped pattern of crop damage. Defendant planned to prove this by the testimony of Harris and by a crucial "admission" contained in the letter written by plaintiff's attorney to defendant, which reads as follows:

> " * * * It was evident from visual inspection this spring that there was a carryover because there were strips of wheat that just came up and then suddenly died."

Plaintiff objected to the admission of the letter on the ground that it violated the attorney-client privilege, and the court excluded the evidence on this ground.

■ The letter is clearly not protected by the attorney-client privilege. In *Sprader v. Mueller*, 265 Minn. 111, 117, 121 N.W.2d 176, 180 (1963), this court, in dealing with a problem analogous to the issue at bar, stated:

> "It is axiomatic that an attorney enjoys broad authority in dealing with the proce-

dural aspects of his client's cause. In modern practice pretrial discovery has resulted in the routine exchange of information on a voluntary basis to obviate the expense of taking formal depositions. We believe that within limits which do not offend our sense of professional propriety (however elusive this definition of the rule may prove to be), *an attorney has the right to use privileged matter for legitimate bargaining purposes.* In so doing, he may waive the privilege without committing any breach of his ethical obligation to respect his client's confidences." (Italics supplied.)

This court went on to quote 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2325(1):

"Since the attorney has implied authority from the client (§ 1063 *supra*) to make admissions and otherwise to act in all that concerns the management of the cause, all disclosures (oral or written) *voluntarily* made to the opposing party or to third persons in the course of negotiations for settlement, or in the course of taking adverse steps in litigation (*e. g., in serving notices*), are receivable as being made under an implied waiver of privilege, giving authority to disclose the confidences when necessary in the opinion of the attorney. This is so unless it appears that the attorney has acted in bad faith toward the client." (Italics supplied in part.)

■ Furthermore, before the attorney-client privilege will apply, the client's communications to his attorney must be made either expressly confidential or under circumstances which would indicate to the attorney that confidentiality was intended. McCormick, Evidence, § 91. The information disclosed by this letter contained only the basic facts of what had occurred to

plaintiff's field. Plaintiff clearly expected these facts to be communicated to defendant. In fact, this letter contained the type of information which plaintiff would be required to disclose to defendant before an action could be brought. See, Minn.St. 336.2–607 and 336.2–714.[1] "Wherever the matters communicated to the attorney are intended by the client to be made public or revealed to third persons, obviously the element of confidentiality is wanting," and the attorney-client privilege will not protect the statement. McCormick, Evidence, § 91. Thus, the exclusion of this letter on the basis that it was protected by the attorney-client privilege was error.

■ However, when a court excludes evidence on erroneous grounds, the ruling will not be overturned on appeal if there was any tenable ground which could have been urged for the exclusion. 1 Wigmore, Evidence (3 ed.) § 18, p. 342 states:

"So, too, a specific objection *sustained* (like a general objection) is sufficient, though naming an untenable ground, if some other tenable one existed."

It is necessary, therefore, to determine whether there is any tenable ground on which to exclude the letter. If there is, the trial court's ruling must be upheld. If not, the ruling was erroneous, and this court must determine whether the exclusion was prejudicial error.

Plaintiff maintains that there is no available ground on which to justify the admission of the letter. Defendant, on the other hand, argues that the letter written by plaintiff's attorney may be used as a vicarious admission against plaintiff under the facts of this case.

The case law on this issue is confusing and ambiguous, and a split of authority has emerged concerning the conditions and circumstances under which an attorney's statements may be used against his client.

---

1. Minn.St. 336.2–607 provides in part: "(3) Where a tender has been accepted

"(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."

Minn.St. 336.2–714 provides in part: "(1) Where the buyer has accepted goods and given

notification (subsection (3) of section 336.2–607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."

This problem was addressed by this court in *Pow-Bel Construction Corp. v. Gondek*, 291 Minn. 386, 390, 192 N.W.2d 812, 814 (1971), where, quoting from *Carroll v. Pratt*, 247 Minn. 198, 204, 76 N.W.2d 693, 698 (1956), this court stated:

" * * * The cases are almost unanimous that out-of-court admissions of fact by an attorney, whether written or oral, which have not been made for the specific judicial purpose of dispensing with proof or for influencing the procedure in the case, are inadmissible in evidence against his client unless it appears that (aside from his mere employment in connection with pending or prospective litigation) the attorney had some special authority to act for his client and that such admission properly related to such special authorization. The mere existence of the relationship of attorney and client does not of itself supply the attorney with authorization to make extrajudicial admissions in behalf of his client, and whether he has been vested with such power to act for his client is to be measured by the same tests of express or implied authority as would be applied to other agents."

In both *Gondek* and *Pratt*, this court held that the alleged admissions made by the parties' attorneys were not admissible into evidence. The facts of those cases show that the attorneys' admissions were oral and made under informal circumstances to the other party. Furthermore, in both cases there was no showing of special authority or authorization given to the attorneys by their clients. The facts in this case are clearly distinguishable from either *Gondek* or *Pratt*.

First, the record reflects some evidence of the attorney's special authority in this case—the letter itself showed the attorney's authority to collect the damages sustained by plaintiff, and plaintiff testified at trial:

"Q * * * Okay, now, am I correct that on and before September 23 of 1975 you had retained Mr. Gustafson and his firm to pursue this matter on your behalf and take appropriate steps to make a claim for you?

"A Yes.

"Q Oh, all right, and as a part of that agreement with them you authorized them to do *whatever was necessary, as far as communicating your claim* to the Gulf Company or starting a lawsuit, or whatever might be necessary, did you not?

"A Yes." (Italics supplied.)

Whether these facts reflect a sufficient "special authority" or "authorization" as required by *Gondek* and *Pratt* is unclear. Other courts, in cases involving similar factual circumstances and applying the same basic rule that has been applied by this court, have come to differing conclusions.

Although this court and most other courts are reluctant to allow the use of an attorney's out-of-court statements against his client, *Pow-Bel Construction Corp. v. Gondek, supra*; 4 Wigmore, Evidence (Chadbourn Rev.) § 1063, many cases recognize an exception where an attorney has authority to present and collect a claim out of court. See, 7 Am.Jur.2d, Attorneys at Law, § 122, p. 123, which provides:

" * * * As a general rule, if an attorney has authority to negotiate with reference to a particular matter or to present and collect a claim out of court, the admissions of fact made by him in reference to the subject of his agency and in the course of the discharge of his duty with respect thereto are competent evidence against his client. *Admissions of fact made in collection letters written by an attorney in reference to a claim in his hands are competent evidence against his client if the attorney was authorized to present the claim out of court.*" (Italics supplied.)

In *Loomis v. New York, N. H. & H. R. Co.*, 159 Mass. 39, 34 N.E. 82 (1893), the court held that statements of fact contained in a collection letter written by an attorney prior to the commencement of the suit were admissible into evidence against his client. The statements tended to show that the injuries to his client which were the basis of the claim were sustained at a place other

than that testified to by the client at the time of trial. In that case, the court stated:

"An attorney or agent employed to present and collect a claim is impliedly authorized to state to the debtor *what the claim is.*" (Italics supplied.) 159 Mass. 44, 34 N.E. 82.

For further cases analogous to the case at bar which apply the general rule cited in *Loomis* as controlling, see, Annotation, 97 A.L.R. 374, 392, notes *III* a and b; 7 Am. Jur.2d, Attorneys at Law, § 122.

As stated, however, there are some cases involving substantially similar factual circumstances to the case at bar where the courts have not allowed the attorney's admissions into evidence against his client. See, e. g., *Hogenson v. Service Armament Co.,* 77 Wash.2d 209, 461 P.2d 311 (1969); *Hall v. Benefit Ass'n. of Ry. Employees,* 164 S.C. 80, 161 S.E. 867 (1932). Many of these cases look to the specific circumstances surrounding the statement to justify the exclusion, such as the tentative nature of the statement, the harm caused to the client, and the basic policy of protecting the client from the inadvertent errors of his attorney. However, as stated in Annotation, 97 A.L.R. 374, 398:

" * * * This view, assuming that the attorney was authorized to attempt collection by negotiation out of court, *seems to be at variance with a distinction recognized by many of the cases*; for while it is undoubtedly true that an attorney employed to conduct litigation has, as such, no authority to prejudice his client's position by communications and admissions not made in the course of management of the litigation * * * according to the prevailing rule he may, if authorized to present the claim and try to make collection out of court, state to the opposite party what the claim is, and his admissions, constituting a part of such statement, may be received in evidence against his client in subsequent litigation." (Italics supplied.)

■ Under the circumstances in this case, it seems that sufficient authority was present, as shown by the letter and plaintiff's own testimony which acknowledged his attorney's broad authority to present and collect his claim. Furthermore, the admission made by plaintiff's attorney was neither oral nor made in the course of casual conversation with defendant. Rather, the statement was written in a letter to defendant, notifying it of plaintiff's claim. This notice was not a mere gratuity, because in any suit for breach of warranty plaintiff is required to give such notice within a reasonable time after he learns of the product's defect. See, Minn.St. 336.2–607 and 336.2–714, and *Kopet v. Klein,* 275 Minn. 525, 148 N.W.2d 385 (1967). The letter was a required step in the procedure of the case. Therefore, the admissions of fact made in the letter are admissible against plaintiff in this case.

■ The trial court's exclusion of the letter was error, and it is now incumbent upon this court to determine whether the error was prejudicial. Defendant claims that the admission contained in the letter tended to prove that the product was overlapped when it was applied to the field, which manifested itself in a striped pattern of crop damage. Defendant's witness did testify, however, that he had observed a striped pattern of crop damage in the summer of 1975. Thus, the jury had the benefit of this testimony for its consideration in determining the question of plaintiff's misapplication of the product. Therefore, while the exclusion of the letter was error, it was not prejudicial.

2. *Hypothetical Question.* The second issue raised by defendant concerns the testimony of Dr. William E. Lueschen, an agronomist with the University of Minnesota Extension Experimental Station at Waseca. Dr. Lueschen was called by plaintiff to give his expert opinion regarding the causal relationship between the application of Outfox and the alleged crop damage. Defendant argues that Dr. Lueschen was permitted to answer a hypothetical question which did not include some important facts. Dr. Lueschen was presented with hypothetical facts in which a 16-acre portion of a 150-acre field had not been treated with

Outfox and the remaining 134-acre portion had been treated with Outfox and subsequently produced a lower yield. Defendant, however, claims that the hypothetical question lacked proper foundation because it failed to indicate whether the "crop management or previous crop history relative to the soil" was similar in both portions of the field.

■ Defendant is apparently relying on the general rule that a hypothetical question must embody all or substantially all of the facts relating to the subject matter on which the opinion of the witness is asked. *Kenney v. Chicago Great Western Ry. Co.*, 245 Minn. 284, 287, 71 N.W.2d 669, 672, certiorari denied, 350 U.S. 903, 76 S.Ct. 182, 100 L.Ed. 793 (1955). However, defendant's objection to the hypothetical question is without merit and can be refuted in several ways. First, the weakest argument, but one presented by plaintiff which does have some merit, is that the hypothetical question did contain the facts and information defendant claims were lacking. Plaintiff, as a part of the assumptions presented to Dr. Lueschen in his hypothetical question, stated inter alia:

> " * * * In this 150 acre field, only 134 acres received the product Outfox, and that one side of the field containing approximately 16 acres did not receive the product Outfox. *That other than that difference, the entire field received the same amount of fertilizer for the corn and the same treatment for the wheat as far as any fertilizer applied, with the soil the same or similar throughout the field and that the moisture to the field, as far as rainfall, that it rained throughout the 150 acre field so that the 16 acre tract not receiving Outfox is the same or similar in all respects as the 134 field. Drainage is the same.*" (Italics supplied.)

Although these sentences do not articulate the point as clearly as might be desired, there is sufficient substance there to meet defendant's objection.

Furthermore, even if the hypothetical question were deficient, Dr. Lueschen's answer to it assumed the needed facts:

> "Q  *  *  *  Doctor, do you have an opinion based upon a reasonable degree of certainty, as to whether or not the application of the product Outfox with cyprazine contained therein, was a contributing factor to the loss of yield that this farmer suffered in the 134 acre tract?
>
> *  *  *  *  *  *
>
> "A  Yes, I have an opinion. And my opinion is that if all other factors were equal, as far as crop management, previous crop history relative to the soil, assuming that the soil and moisture were not different, soil types, all of these things were identical, then I would have an opinion that the cyprazine most likely was the major contributing factor to this."

Although defendant objected to the answer as nonresponsive, all the basic facts needed for Dr. Lueschen's opinion were put before the jury with his answer.

Second, even if the hypothetical question did not contain or embody substantially all of the facts relative to the subject matter on which the opinion of the witness was asked, this rule is not always strictly applied, and minor inaccuracies or omissions are often overlooked by the courts.

■ In this case, the transcript of plaintiff's hypothetical question to Dr. Lueschen is approximately 2½ pages in length. This issue should not be resolved by searching the entire record to determine whether every possible fact was listed by plaintiff in his hypothetical question. Rather, the issue should be resolved by determining whether the question contained enough facts to permit the expert to give a reasonable opinion which is not based on mere speculation or conjecture and which is not misleading to the jury. This court in *Aasen v. Aasen*, 228 Minn. 1, 9, 36 N.W.2d 27, 33 (1949), in dealing with a problem substantially similar to the case at bar and quoting 2 Wigmore, Evidence (3 ed.) § 682(b) with approval, stated:

" 'The [hypothetical] question, on principle, *need not include any particular number of facts; i. e.* it may assume any one or more facts whatever and *need not cover all the facts which the questioner alleges* in his case. \* \* \* For reasons of principle, then, and to some extent of policy, the natural conclusion would be that the questioner need not cover in his hypothesis the entire body of testimony put forward on that point by him or by the opponent, but may take as limited a selection as he pleases and obtain an opinion on that basis. Such is the orthodox doctrine as applied by most Courts.' "

The court then went on to say:

"It is true that the hypothetical question propounded and objected to in the instant case did omit a fact, but we believe that the question did embody substantially all the facts and that the omission was a minor inaccuracy. A consideration of the question in the context of the examination of the witness does not show that the testimony would present a false picture or that the jury would be misled. The purpose of such testimony is to assist the jury in reaching a correct conclusion from the facts in evidence, and this court is inclined to defer to the judgment of the trial court as to the weight to be attached to the testimony of expert witnesses. *O'Connor v. Pillsbury Flour Mills Co.*, 197 Minn. 534, 267 N.W. 507." 228 Minn. 10, 36 N.W.2d 33.

In the case at bar, if any facts in plaintiff's hypothetical question were omitted they were probably insubstantial, insignificant, and only minor inaccuracies or omissions. Certainly, the jury was not presented a false picture, and no injustice is shown to have occurred.

■ Finally, it is fundamental that the trial court has broad discretion in determining the sufficiency of the foundation laid for an expert opinion. This court, in *Briggs v. Chicago G. W. Ry. Co.*, 248 Minn. 418, 429, 80 N.W.2d 625, 635 (1957), stated:

" \* \* \* Whether a hypothetical question presents an adequate foundation for an expert opinion rests largely in the discretion of the trial court and its decision will not be reversed except for a clear abuse of that discretion. Although the burden of framing an adequate hypothetical question rests upon the propounder and he may not cast the burden of supplying its deficiencies upon opposing counsel, nevertheless, in passing upon the question of whether prejudicial error occurred, it is not to be overlooked that an adversary enjoys certain safeguards in that he may on cross-examination supply omitted facts and ask the expert if his opinion would be modified by them."

■ Plaintiff's hypothetical question, in the instant case, contained sufficient factual foundation, and if there were any deficiencies, they could have been brought out by defendant on cross-examination. Under the circumstances, no abuse of discretion by the trial court has been shown.

3. *Negligence Instruction.* Defendant contends that the trial court's refusal to give a requested instruction on comparative negligence resulted in prejudicial error. The trial court did not base its refusal on the absence of any evidence of negligence but rather on the belief that this was not the proper law to be applied.

■ There is, unquestionably, ample evidence in the record to support the requested instruction. The label on defendant's product was silent as to whether it could be applied aerially. As a witness for plaintiff, Gieseke, the aerial applicator, testified that he had previously applied chemicals by air when the label was silent as to whether it could be applied by air. Several witnesses for defendant, however, testified that when the label is silent as to aerial application, it should not be so applied.

■ Minnesota has consistently taken the position that in actions based upon breach of warranty, the issue of the contributory negligence of the buyer of the product should be submitted to the jury in so far as his right to recover consequential damage is concerned. In *Nelson v. Anderson*, 245 Minn. 445, 450, 72 N.W.2d 861, 865 (1955), we stated:

"While there are cases to the contrary, we believe that the weight of authority and sound reason support the view that, in an action based on a breach of implied warranty, contributory negligence of the buyer is a good defense insofar as a right to recover consequential damages is concerned."

See, also, *Gardner v. Coca-Cola Bottling Co.*, 267 Minn. 505, 511, 127 N.W.2d 557, 562 (1964). This court has never directly decided whether our comparative negligence statute applies in cases involving breach of warranty; however, we need not reach that issue here. Under the instructions given, no comparison of negligence was called for. In fact, the charge seemed to indicate that if plaintiff unreasonably misapplied the product in any way, he could not have recovered. Defendant, therefore, benefited more from the actual instructions given than it would have from the ones it requested. Under these circumstances, it is very difficult to see how defendant was in any way prejudiced. An appellant must be an "aggrieved party," *Risvold v. Gustafson*, 207 Minn. 359, 292 N.W. 103 (1940), and he cannot complain of errors that operated to his own advantage. *Allen v. Florida & Southern Dredging Co.*, 180 Minn. 514, 231 N.W. 204 (1930); *Gibbons v. Yunker*, 145 Minn. 401, 177 N.W. 632 (1920). It is clear from the jury's verdict that it did not find a misapplication of the product by plaintiff.

4. *Disclaimer of Warranties.* Defendant's next assignment of error is the trial court's refusal to give its requested instruction regarding the disclaimer of express and implied warranties. The disclaimer provision found on the product's label reads as follows:

IMPORTANT NOTICE—Conditions of Sale: GULF warrants that this material conforms to the chemical description on the label and is reasonably fit for use as directed hereon GULF neither makes nor authorizes any agent or representative to · make any other warranty of FITNESS or of MERCHANTABILITY, guarantee or representation express or implied, concerning this material. Critical and unforeseeable factors beyond GULF's con-

trol prevent it from eliminating all risks in connection with the use of this material. Such risks include, but are not limited to damage to plants and crops to which the material is applied. Such risks occur even though the material is reasonably fit for the uses stated hereon and even though label directions are followed Buyer and user acknowledge and assume all risks and liability (except those assumed by GULF in the preceding paragraph) resulting from handling, storage, and use of the material.

Defendant argues that this disclaimer provision is effective in excluding all express and implied warranties the product may have carried. This contention is without merit.

█ The principal thrust of plaintiff's case was that the chemical cyprazine, contained in Outfox, remained in plaintiff's field into the succeeding year after application, causing a buildup or carryover of chemicals which damaged the subsequent year's wheat crop. Plaintiff points out that the label on defendant's product specifically warrants against carryover damage. The label reads as follows:

Outfox is a low carryover herbicide, and when applied at the recommended rate, normal crop rotation is possible the season following OUTFOX application. This includes rotating to small grains, soybeans or other legumes, but not to sugar beets.

In addition, defendant's own expert witness, Dr. Schwartzbech, specifically stated that Gulf warranted that the product Outfox would not carryover and would not damage the succeeding year's wheat crop. Furthermore, the first sentence of the disclaimer provision in effect gives an express warranty of merchantability.

Minn.St. 336.2–316(1) provides:

"(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this

article on parol or extrinsic evidence (section 336.2–202) negation or limitation is inoperative to the extent that such construction is unreasonable."

By studying the language of the two warranty provisions found on defendant's label, quoted above, it appears that defendant has attempted both to warrant its product and to disclaim any warranties. It is clear that defendant's words of warranty and disclaimer cannot be reasonably reconciled with one another, as required by § 336.2–316(1), and thus the language of the express warranty must prevail.

This express warranty, coupled with the jury determination that plaintiff had applied the product in accordance with the label instructions, should itself be enough to entitle plaintiff to the verdict without the necessity of considering the consequences of whether the implied warranties were properly disclaimed.

5. *Negligence Per Se.* Defendant's final assignment of error is the failure of the trial court to instruct the jury with respect to Minn.St.1974, §§ 18.031 to 18.032.[2] These statutes define the obligations of persons dealing with spraying and dusting in the State of Minnesota.

Section 18.032, subd. 3, provided in pertinent part:

"Each person, or his authorized agent, shall keep and maintain a record of each property treated. Such a record shall include but not be limited to the following: Date of treatment, material and dosage used, number of units treated, name of customer, name of applicator and signature of operator."

The only written record or document concerning the spraying of plaintiff's field does not conform to the requirements of § 18.-032.

Defendant contends that this statute imposes a specific duty on plaintiff which he neglected to fulfill. It argues that the clear purpose of Minn.St. c. 18 is to require recordkeeping so that checks can be made to assure that the proper amounts of a product were applied. Thus, according to defendant, plaintiff's failure to keep such records violates the statute, and is negligence per se.

Although on first impression defendant's reasoning appears sound, its interpretation of the statute is erroneous. It is clear by reading c. 18 as a whole that the words, "[e]ach person, or his authorized agent," found in § 18.032, subd. 3, refer not to the owner of the farm whose crops have been sprayed, but rather to those businesses which engage in crop dusting and to the employees they hire to apply the chemicals. In this case, Nicollet Ag Services and Gieseke were the parties bound by this statute. Any other interpretation would be unreasonable.[3]

Thus, the provisions of §§ 18.031 to 18.032 are not applicable to plaintiff and are therefore irrelevant to the issues in this case.

Having disposed of defendant's assignments of error, we hold that the lower court's decision must be affirmed.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.

2. Minn.St.1974, §§ 18.031 to 18.032, were repealed by L.1976, c. 53, § 29. See, Minn.St. c. 18A.

3. Minn.St. c. 18A, now makes it doubly clear that this statute includes only professional commercial applicators. Minn.St. 18A.28, subd. 2, provides: "Each licensed commercial applicator, or his authorized agent, shall keep and maintain a record of land treated. Such a record shall include, but not be limited to, the following: date of treatment; material and dos-

age used; number of units treated; name and address of customer; name of applicator; and signature of operator. Invoices containing the required information may constitute the required record. A copy of his record shall be given to a consumer. Records shall be kept and be available upon request of the commissioner or his agents or officials of an approved agency for a period of two years from the date of treatment."